We'll hear argument first this morning in Case 17-6086, Gundy v. United States. Ms. Baumgartel? Mr. Chief Justice, and may it please the Court, SORNA's delegation provision grants unguided power to the nation's top prosecutor to expand the scope of criminal laws and to impose burdensome, sometimes lifetime registration requirements on hundreds of thousands of individuals. It combines criminal lawmaking and executive power in precisely the way that the Constitution was designed to prohibit. This delegation is unconstitutional. This delegation can be distinguished from every delegation that has previously been upheld by this Court due to a combination of its total lack of standard and the nature and significance of the delegated power. Unlike other delegations that this Court has approved, SORNA has no standard to guide the Attorney General's exercise of discretion. Well, the government says that they do have a standard, and it's the apply the prohibition or the requirements in the law to the maximum extent feasible. Your Honor, that language does not appear anywhere in the statutory text, nor can it be derived from the sources that the government cites. What about the list that's contained in, what is it, 20901, the list of past offenders? On your view, none of those people would be required to register. That's not correct. So one important thing about this case is that every state had an existing sex offender registration system prior to SORNA's enactment, and those registration systems would remain in effect regardless of whether SORNA existed or not. And so, for example, Petitioner was required to register under existing Maryland law, and so would the vast majority of sex offenders who were also then required to re-register under SORNA. These State registration systems had been in existence, many of them since the early 90s, but since 1996, every State had its own registration system. But they would be, they would not come under the Federal registration system, which was the purpose of SORNA to create. None of those examples would be covered by the Federal registration requirement. Well, as this Court held in Reynolds, Congress left it to the Attorney General to determine whether SORNA would apply retroactively at all. And so Congress declined to make the initial decision as to whether any pre-Act offender should be required to register. This was consistent with how Congress had approached registration schemes in the past. Congress had previously enacted registration legislation that conditioned State funding on requiring certain things from sex offender registries. And in each of those prior cases, Congress had not made the law retroactive. And so there's nothing strange about Congress doing this. As the Court held in Reynolds, it then gave the Attorney General full authority to decide whether the law should be applied retroactively, so the initial on-off determination, but then as well how it should apply, which offenders should be included, if it should extend all the way back to 20, 30, 40 years. There was absolutely no guidance provided to the Attorney General in making that decision. Well, suppose the statute said that the Attorney General shall have the authority to determine the application of this subchapter to pre-enactment offenders as public safety and fairness requires. Would that be a violation of the non-delegation doctrine? Yes, Your Honor. Given the subject matter of this delegation, Congress needs to provide more guidance than something along the lines of in the public interest. And what about the most famous regulation that I think people in this room would imagine, Rule 10b-5? I mean, Rule 10b-5 is promulgated under a statute that says the SEC can forbid the use of any manipulative device, that's like the sex offender part, in contravention of such rules as are appropriate in the public interest. So there are a few distinctions. One is that the SEC obviously is a different body than the Attorney General. And so this is a point where the Court's due process and delegation concerns converge. And it's important from the Constitution to have a separation between the body that is the regulatory lawmaker and the body that is the prosecutor. Is it only the Attorney General who falls within the rule that falls within your argument? That's something that exacerbates this delegation. No, but I'm like, look, the SEC has a rule such as we know, 10b-5, the word is the public interest. The Consumer Product Safety Commission has another one, very similar. And we're told in one of the briefs that there are 300,000 such regulations. That may be an exaggeration. I don't know. So which, in fact, fall, as you said, within your especially harsh rule? All of the 300,000 will be busy in this Court for quite a while. Your Honor, it's not an especially harsh rule. What it would require is some more. Your especially strict rule. Some more specific congressional guidance when this power is delegated. And a few things to say first. Sotomayor, you're answering, Justice Pryor, yes, that all 300,000 of those, whatever the number is, of those delegations are wrong? No. That's absolutely not our position. So what distinguishes those, that delegation or those delegations from the example that Justice Alito gave me? So in each of the prior delegations that this Court has upheld, there has actually been some standard in the delegation provision, even if it was what the Court might consider to be a broad standard. There are standards here. I mean, it's not the Attorney General. It's the Congress that defines what crimes will require registration, where and when the individual is required to register, what information is necessary, and the penalties for failure to register. All that is specified by Congress. The Attorney General doesn't have – is not at liberty to prescribe when, where, how, what crimes. All that is done by Congress. But none of those very detailed provisions of SORNA that Congress set forth apply to pre-Act offenders. The Attorney General was given the power both to decide whether the law applied to pre-Act offenders and then how it should apply. Well, that gets back to the question that the Chief Justice started with, because it seems that there is some language in the statute that supports the government's reading, that this is a statute that basically says register all pre-Act offenders as far as possible with some understanding that there are feasibility considerations that may make immediate registration of everybody impossible. So comprehensiveness but moderated with a feasibility understanding. And I think you would point to three things. You would point to the preamble, which talks about a comprehensive national system. I think you would point then to the definition, which says that the term sex offender means an individual, any individual, an individual who was convicted of a sex offense. And I think to get in the idea of feasibility, you might look to the delegation provision itself, which talks about categories of sex offenders who are unable to comply with subsection B. So both comprehensiveness as moderated by some flexibility, some feasibility constraint seems in the statute as long as you're taking the statute as a whole. So there are a few problems with reading it that way. To start with the fact that in J.W. Hampton, the court emphasized that the intelligible principle had to be clear from the legislative act itself. And so to the extent that the court is looking through other provisions. From the legislative act itself, meaning only from the delegation provision? So from the legislative act. And so to start. But this is the legislative act. These are all parts of the statute. That's right. And in Panama refining, the court rejected the idea that if there was a narrow delegation provision that did not contain any standards, that that could then be governed and given content by the general preamble to the act, which is exactly the argument that the government is making. Well, but when we are thinking about non-delegation, it's essentially a statutory interpretation question. Which it seems should be governed by the same rules of statutory interpretation that we use elsewhere. And we never look only to one provision. We look to one provision in a context of other provisions, including purpose provisions. So if you look at Justice Scalia's, Justice Scalia was a pretty committed textualist. If you look at his separate opinion in Reynolds, he clearly is looking to the purpose provision of this act. And saying it demands comprehensiveness. So, Your Honor, I agree 100% with you that this could be a statutory interpretation issue. But we would prevail under that. The problem with the government's statutory interpretation argument is that the delegation provision here is not ambiguous. It gives plenary authority to the Attorney General. When the Court looks to, say, the statutory context or legislative history, things to interpret that statute, that's generally when the text itself is ambiguous and provides for two different plausible readings. But here, that's not the situation. I just note Justice Scalia was dissenting, of course, in Reynolds. Kagan. He was dissenting, but nine justices in Reynolds all had the same view of this statute, which is that this statute demanded comprehensiveness in the registration of pre-act sex offenders. In other words, both in the majority and in the dissent, this was the one point in common, that they said this statute was designed for something and this statute did something, that it insisted that sex offenders should be read broadly to include any individual who was convicted of a sex offense and that all those people should be registered, you know, with some feasibility recognition. So I'd like to address both comprehensiveness and the definition of sex offender while also noting that, of course, if Congress had actually wanted that construction, it would have been very easy for it to simply say that. Well, but nine of us said it. Were we all wrong, every single one of us? Your Honor, I don't believe that's what Reynolds says, but just with respect to because comprehensive is coming up so many times, the preamble states that it is a comprehensive national registration system. In the same way that the National Gallery is a comprehensive art museum, that doesn't mean that it has every painting that has ever been made. Comprehensive can have different meanings. In this context, SORNA is a 40-something provision statute that addresses every aspect of sex offender registration, not just who should register, but information sharing among jurisdictions, the Internet design of websites for public registration, civil commitment of sex offenders, the use of federal law enforcement resources to assist with state registration systems. These various provisions comprise the comprehensive national registration system, and there's no indication that that general preamble meant that every pre-Act offender had to be registered. There was a House bill that was rejected that was pending at the same time that would have both made it explicitly retroactive and that included a definition of sex offender that explicitly said offenders convicted either before or after the enactment of this Act. I guess I have two quick questions. I'm sorry. Well, I guess where I get stuck on the preamble argument is that normally we, when we're doing statutory interpretation, prefer the more specific statutory provision over the more general. And the specific statutory section dealing with pre-enactment offenders says unambiguously that the attorney general decides whether, how, when, and who, even who. So you don't even know if you're going to be subject to this law. Yes. How do people even know who is going to be included in this class until they hear from the attorney general? And I'm having trouble thinking of another delegation in which this Court has ever allowed the chief prosecutor of the United States to write the criminal law for those he's going to prosecute. We say that vague criminal laws must be stricken. We've just repeated that last term. What's vaguer than a blank check to the attorney general of the United States to determine who he's going to prosecute? Yes. Your argument is stated very concisely. I'll cede my time. Well, then I'll take back my time. Suppose this was, what was at stake here was civil liability rather than, suppose what was at stake here was civil liability rather than criminal liability. Would you make the same argument? That would certainly be a much closer case. Our argument is that SORNA would still be unconstitutional simply because of the total lack of standard. Even in cases like NBC or American Power and Light where the Court has upheld arguably very broad delegations, there has been some standard in the law that even if seemingly broad as written, drew upon an existing body of established law. So, for example, in NBC, the public interest convenience and necessity certification for licensing was an established body of law that it was a certification that states had made to public service industries since roughly the 1870s. There's no existing body of law to give context. So if you compare what we have before us with the statute that says, authorizes the attorney general to devise a rule to protect public safety, feasibility, and consideration of individual rights, that's the difference between improper delegation and proper delegation. In the civil context, let's start there. Certainly the congressional guidance is the difference. And this just comes back to the purpose of the test itself. The idea of the intelligible principle test is that it's not a delegation of legislative authority because Congress itself has made the key legislative decisions. Here, with respect to pre-Act offenders, Congress has not made any of the decisions despite the extremely detailed framework that there is for post-Act. Ginsburg. Do you think the attorney general could, in that retroactivity, have a different set of offenders than the text of Fauna? Fauna itself have different requirements for where and when the registration is to occur? Yes. And this is something the Court contemplated in Reynolds, where it noted that 209-13D, the delegation provision, essentially gave the attorney general three different spheres of authority. He could decide whether the Act applied to pre-Act offenders, whether it applied to pre-implementation offenders, and then how it applied to those offenders. And the Court recognized that he might, for example, want to set different registration rules for different classes of pre-Act offenders. And that was contemplated and permitted by the broad plenary grant of authority. What if the Act said that it applies to pre-Act offenders, and there was a provision saying the attorney general may waive the requirements of this Act when he determines that it's not feasible to apply them? And the attorney general says, you know, I don't think it's feasible to apply this to pre-Act offenders, so I waive the Act with respect to pre-Act offenders. Is that okay? So if the Act said this, Congress determines that this should apply to pre-Act offenders, and then gave the attorney general a limited power to grant exemption, something which is basically the opposite of what this as written does, that would likely be constitutional, particularly if the – if Congress provided some guidance around which. Even though the consequences are the same? The consequences are the same with respect to whether – who's making the decision about whether the criminal laws should apply to whom? Respectfully, the consequences are not the same. In the first instance, Congress has made the decision. And then they have afforded the attorney general a power that is – first, if there is guidance provided with respect to the granting of exemptions, then it's still Well, let's say it isn't. The attorney general may issue exemptions to this Act with respect to particular categories of offenders. Even – even if, that would still be much closer to being constitutional, because Congress has made the initial decision and has afforded the attorney general a power that is something more akin to traditional prosecutorial discretion. It's not the same, but this was the point that Justice Scalia, joined by Justice Ginsburg, made in dissent in Reynolds, which is that that is much – that seems closer to being constitutional because the power that the attorney general has is closer to a traditional clemency or prosecutorial discretion power. In this case, however, the statute is truly worded in the opposite fashion. It does not apply of its own force to any pre-Act offenders. And the question of whether it should apply is left to the sole discretion of the attorney general. Do we routinely read into statute limitations in order to save its constitutionality? Yes. We do that routinely. And we have read into delegation cases limits. So why is the reading in a feasibility here so unusual, given the three contextual signals that Justice Kagan listed previously? So there are three reasons. One is that that is essentially the interpretation that the Court rejected in Reynolds, that that was squarely the government's argument in Reynolds and the Court said, no, that's not a plausible construction of this statute. The second reason is that in the context of the intelligible principle, it is essential that Congress itself state the intelligible principle. The Court addressed this in American Trucking v. Whitman, where there the agency itself had tried to propose a limiting construction to the delegation. And the Court rejected that and said that the imposition of that limiting construction would be the exercise of the constitutional, the legislative power itself. And so the imposition of that limiting construction would be unconstitutional because it's exercising the legislative power. Sotomayor, can we go back to you? Mention your third, but on the first, fold it in. In Reynolds, we said that it would have been strange indeed for anyone to imagine that Congress intended the AG, I'm trying to put it in the deposit, that Congress intended the AG to apply the Act retroactively. It would have been strange for them to imagine that he or she wouldn't, that there might have been limitations because of some feasibility difficulties, but no one imagined the AG would exempt everyone. The intelligible principle cannot be the Court's speculation about what Congress thinks the Attorney General might do. But we're speculating from the Act itself. It's not speculating, it's interpreting. So if the best interpretation, and I realize you don't agree with this, so I'm posing it as a hypothetical. If the best interpretation of the Act is the SG's interpretation, do you agree that that would not pose a delegation problem? No, I don't agree. And so if the, my friend uses different formulations of their interpretation. Sometimes it's to the maximum extent feasible. Sometimes it's to the extent feasible. Sometimes it's to the extent practicable. And I would argue that there is, there are differences there. Let's call it, which is I think consistent with what Reynolds said, to the maximum extent feasible. In other words, what the Act is telling the AG is go register pre-Act offenders except if you find it unfeasible. Again, that's nowhere in the statute. I understand that you think that. But if the statute, if that is the best interpretation of the statute, would it pose a delegation problem? That likely would be constitutional if you could read into the statute a command to the Attorney General to register pre-Act offenders to the maximum extent feasible. Although, you know, as Justice Rehnquist articulated in Industrial Union, the benzene case, there is still a question about what feasibility means. And in this context particularly, because these are not, this is not a technical scientific area. This is not a question of how much air particle at what cost can be taken from the environment. This is really the fundamental weighing of liberty versus security interests, the sorts of decisions that the people's legislative body is supposed to make and not supposed to delegate to the chief prosecutor. Are we supposed to do that? And say, well, you have a weak standard if all that's at interest is the cost of pollution or something. But you have to have a strong standard where, in fact, it's what you said, the liberty and so on. And a medium standard perhaps for the SEC. I don't know what we do about the SEC. And there are 300,000 approximately. Maybe there are only 200,000. But is that what you're suggesting we ought to do? Yes? No? Yes. And the Court in America, I should, Your Honor, I should, I'm not conceding the 300,000. No, I wouldn't either. This is, this is what the Court said in American Trucking v. Whitman, that the amount of guidance required depends on the scope of the delegated power. Okay. So if we're supposed to go through the 200,000 or 100,000 or whatever they are, what are the different categories where it's tough, not so tough, in your opinion? Your Honor, the question is not a matter of tough versus not. No, no. You see what I mean. Categories where Congress can delegate with an SEC-type standard or the standard here. In categories where Congress has to be more specific. What, in your opinion, are the right categories? So the factors about SORNA that are critical include the fact that it contemplates criminal sanctions. In 2B, this Court recognized that it's precedent-supported, requiring greater guidance for the promulgation of regulations that contemplate criminal sanctions. But, Your Honor, isn't that all over the place? We have confronted delegation challenges to civil regulations whose violation will result in criminal sanctions. So, I mean, there are numerous of those cases, but I'll just give you three. CALEC is like that. GRMO is like that. Avent is like that. So these are all places where the delegation is to a civil regulation, as it is here, but if you violate that regulation that some secretary or attorney general or whatever has written, you're going to face criminal sanctions. So what's the difference between this case and all those other cases where we said, you know, criminal sanctions is not what matters? Well, CALEC is the perfect example because this is very different than oleomargarine label. This is not a question of Congress. You know, you can say that, and it's easy to make fun of oleomargarine labels, but the person who violated that provision was going to go to prison in the same way that the person who violates this provision is going to go to prison. It's not making fun, Your Honor. It's that there are certain fundamental choices about a statutory scheme that Congress itself must make, and so Congress can say that there needs to be particular packaging and a label, and then it can delegate or assign to an agency the power to design that label. The point I was making is that all of these are civil regulations. The delegation is to say, you write the – we're going to give you some degree of discretion to write the civil regulation, understanding that if somebody violates that, that person is going to jail. Your Honor, may I answer your question in the reserve of the remainder of my time? Just the question is always the nature and significance of the delegated power, and it is perfectly fine for Congress to permit agencies to fill in the details or otherwise implement statutes, but not to make these sorts of fundamental policy choices. Thank you. Thank you, counsel. Mr. Wall? Mr. Chief Justice, and may it please the Court, I wanted to start this morning where Justices Ginsburg and Kagan did with the text of the Act, because I do think it is best interpreted in the way that we have said. It starts in the first section. This is at 3A of the appendix of the government's brief, with findings about existing sex victims and their offenders. It then says, quote, we want a comprehensive national system, end quote, to address the offenders. It broadly defines sex offender and the registration requirement. That's at pages 5A and 11A. And then it says in the 913D, it says, look, we know that translating the system that we've just crafted for offenders going forward is going to create some real practical problems. For one, it's literally impossible for them to comply with the timing requirement. Unable to comply. Those are the words in the title and text of 913D. So we are going to give to the Attorney General the authority to take this scheme and implement it with respect to pre-Act offenders, recognizing that there are going to be some transitional issues. That kind of implementation is a classic executive function. It is what statutes give to the executive branch all the time. And Petitioner has conceded, I think just now, that if the statute is best read in the way I'm positing, that it's perfectly permissible under this Court's cases. Roberts. Well, let's take one of the items you just mentioned, comprehensive. The Act says that it's comprehensive. That doesn't mean that it covers everything. It means that it has a scheme that it thinks addresses the waterfront. And part of the way it does that is to say we're not going to decide this significant category of cases. It's comprehensive. They've told you what's going to happen there. And what they've said is the Attorney General gets to decide. Oh, it's certainly true that Congress made certain legislative judgments about what sex offenses would qualify, how long people would have to register for. They didn't say every offense that relates to sex means you've got to register for a lifetime. That is certainly true. But once they've defined the bounds of the people they want into the system going forward, then they said to the Attorney General, your job is to get as many of the existing offenders who fall into that universe into the registries as you can, recognizing there are going to be some practical barriers. You're going to have to specify the applicability of the requirements in a way to get them in. That's very narrow language. The government didn't make that argument in Reynolds. The government made the opposite argument in Reynolds. The government said that D is the more specific provision, and the nature of the comprehensiveness, as the Chief Justice indicated, for purposes of pre-enactment offenders was that the Attorney General gets to decide. And the Attorney General could decide to do nothing, the government said. The Attorney General could decide to include some offenders, none of the offenders, or all of the pre-enactment offenders. The government said that it could then determine which of the Act provisions it wished to, in a Chinese menu manner, apply to these people it had chosen. The government then said the Attorney General could change his or her mind about all of this at any given time. And, in fact, the Attorney General has changed his mind from time to time on these matters. So how do you square with what you just told us with the government's prior representations in this case? Well, the Attorney General has never changed his or her mind with respect to the registration duty for individuals. But to go squarely to the question. There have been changes. Only with respect to the State's obligations to go out and find offenders. Not with the individual duty on offenders to come forward and present themselves and register. Attorney General Holder changed the guidance provided by the prior Attorney General, correct? He narrowed the State's obligations to give the States a little more breathing room. That's true. The individual duty to step forward and register has always been constant. But to go to your question, I really don't think that reading our brief in Reynolds there's any inconsistency. We came in and said it's a statutory matter. This says he shall have the authority to specify the applicability. That clearly means, since we know that they want everybody in, that we should read that like a waiver provision. And to be sure, the Court disagreed with us on that and said the default rule was different. But in the process accepted exactly our argument as the premise that the default rule didn't matter because Congress wanted everybody into the system. And so I think everybody was working off of that page in Reynolds. Your brief in Reynolds is very important to me. If I read it the way Justice Gorsuch does, assume his hypothetical, that you in fact said it was an on and off button that the Attorney General could turn on and off. That's the position you took then. What does that do to you now? Oh, that's, to be clear, Justice Sotomayor, that's exactly the same position I'm taking here today. 913D is No, you're adding in a caveat. You're saying he can turn it on and off based only on maximum lack of feasibility. No, I'm addressing a question that wasn't squarely before the Court in Reynolds. It is an on-off switch to the Attorney General. Specify the applicability of the requirements. It's pretty narrow language. And do it in such a way as to get them in. I read it as a statute. Now, you're reading to get them in. I understand Justice Gorsuch's point that you said he could turn it on and off as he decided. Yes, that's the Attorney General's authority as a statutory matter. That's what the statute means. I believe the statute means the same thing we said in Reynolds, though the Court disproves in the default rule. The separate question is, is there guidance provided to the Attorney General in the statute on how he should exercise that on-off switch authority? And that question, not before the Court in Reynolds and not briefed in Reynolds, the answer to that is pretty obviously yes. I mean, this falls well inside a number of the delegations that the Court has looked at, because here it's not as if there is some standard in the statute like public interest or fair and reasonable rates where the executive is really doing the fleshing in. Here Congress set forth all the rules. It made judgments about all the requirements. And all it said to the Attorney General. But there's an obvious argument on that score that under your view that Congress could have simply enacted a statute with respect to post-enactment offenders that mirrored the language of D and said, well, it's up to the Attorney General to come up with a comprehensive and feasible registration regime in the public interest. You'd be here defending that, wouldn't you? Justice Gorsuch, it would be a much broader delegation. Under this Court's cases, you'd need more of a general policy. It's not at all clear why Congress wouldn't apply it going forward. Well, what's the difference? Half a million people are affected by this delegation. Yes. If Congress found there are real practical problems with applying it even going forward, here's our general policy to the Attorney General. I don't know that it would be importantly different from saying to the Attorney General in Toobie which drugs will be controlled substances under the Act. Or in Union Bridge, which bridges will we think obstruct the rivers? Or in Grimaud, who will be allowed to graze on Federal land? Could you answer my question? Would you be here defending a statute that mimicked D with respect to post-enactment offenders? In which case, why does Congress bother to legislate SORNA at all? It's very difficult to know in that situation, Justice Gorsuch, what the equivalent practical problems would be for why Congress didn't apply it. So you might defend that statute, too. No. What I'm saying is I don't know. I don't see any practical problems that would have required Congress to legislate in that way. So it's very difficult to imagine that that statute would pass muster. But if there were similar practical problems, and if they supplied a general policy, it wouldn't be importantly different from Loving or Grimaud or Fahy or Collick or Union Bridge. Ginsburg. Mr. Wall, can you tell me how this retroactivity works? So let's take somebody who was convicted of a sex offense 30 years ago. He's had a clean record ever since. First, tell me how such a person gets notice of the registration requirement. So he's only required to register if he's a Tier 3 offender. So if he's got a really grave sex offense-like petitioner. Yes, but let's say he is such an offender, but it was 30 years ago. Yes. So I think he's on notice from the enactment of SORNA and then the Attorney General's interim rule in 2007, carried forward in the final rule in 2010, that there's an across-the-board registration requirement. So he has to know what the Attorney General's regulation is? There's no notice given to these people. They can be charged with having to register, even though no one ever gave them notice that they had to register. I suppose you could try to bring an as-applied due process challenge. Of course, petitioner's not going to be able to do that. Petitioner was informed in 2012, before he left the BOP's custody, both in writing and orally, that he needed to register when he moved to New York, and then he failed to do it. So I take the point that there could be as-applied notice problems, but I don't think that there's one here. And to get back to the colloquy I was having with Justice Gorsuch, I do think at the lays out a general standard, and then requires all of the fleshing in, that the court has held as permissible, provided you supply a general policy. But it really is inside even that, because Congress set up a pretty reticulated scheme, made a lot of judgments along the way. Do you think that if there were a new Attorney General who came in and said, you know, I think that this registration stuff has just gone overboard, and I'm going to start making some exceptions with respect to pre-act offenders? Because I think that's just unfair to penalize them for the rest of their lives. Could the Attorney General do that? No. We don't think the Attorney General could make judgments on the basis other than feasibility, and disagree with Congress's policy judgments. And if the court had any doubt about that, it should construe the statute more narrowly, in the way I think is the most reasonable interpretation, so as to avoid the Constitution problem. And when you say the Attorney General could, tell me what you think the Attorney General cannot do, given the language of this statute, and given the language of Reynolds. So I don't think the Attorney General could say, look, I know Congress set up three tiers with registration lengths of 15, 25 years in life, but I'm going to require you to register, but only for a few years. It's perfectly feasible. I could require you all to register, and there would be no problem on the State Registries, but I just disagree with Congress's judgment that you ought to register. I don't think the Attorney General could do that. Breyer. I'm trying to think. I think Mrs. Baumgartner was trying to make a point that, in my mind, is something like this, that the executive branch has many different functions. They do all kinds of different things. One of the things they do is prosecute people. Now, it's quite different from the SEC and all these other agencies, because they have other things to do. And moreover, there's a safeguard going through the Department of Justice. And there is a particular danger when you combine prosecuting a person with the writing of the law under which you prosecute. And the danger is captured in the Bill of Attainder Clause. It's captured maybe in the Ex Post Facto Clause. It's captured in the word liberty. And it is that particular danger that means where you have a person whose job is prosecuting, be careful, especially careful, that that person cannot also write the law under which he prosecutes, because there we risk vendetta. Now, I think my interpretation of what she's saying is something like that. So what is your response? So I do think that plays itself out in certain rules, like not deferring to the executive on the interpretation of criminal statutes. But the courts considered that argument twice in the non-delegation context and rejected it both times. In 2B, they made exactly the same argument. They said, look, you can't delegate to the executive branch which substances will be controlled under the Act, because they're both defining what's illegal to possess, and they're prosecuting you. And in 2B, you said, no, not for non-delegation purposes. That controls from one branch to the other. Not where the power is allocated within the executive branch. And even more to the point, in Loving, there was the availability of the death penalty. The President was just specifying aggravating factors nowhere to be found in the statute. And this Court, where you were actually – the executive was actually defining the criminal penalty, which is not what the executive has done here. This Court said, we've upheld delegations whereby – this is at page 768 of Loving. We've upheld delegations where the executive defines by regulation what conduct will be criminal so long as Congress has created the criminal offense. Breyer. Those are the standards.  Fixed the punishment. Breyer. Right. But suppose you put – Roberts. And given the executive the authority. Breyer. I see where you're going there. But what we've been arguing here is basically the non-delegation doctrine informed, perhaps, by the need to prevent vendettas in liberty. Suppose you reverse that. Suppose you said the problem here is a due process argument. It is a liberty-protecting argument. And in interpreting that liberty-protecting argument, we should inform our thought with non-delegation principles. Justice Breyer, I just think the non-delegation context is a very odd one in which to try to cash that out as opposed to vagueness or due process, because it's asking whether Congress has made the basic policy judgments that can inform the executive's exercise of power. And, boy, if the executive can define the availability of the death penalty in Loving and Mastretta, here it seems well withinside that to say, look, this is a civil requirement. Yes, there are criminal penalties that could potentially attach, but that's a commonplace feature in the law. The IRS tells you what kind of tax return you've got to file. Now, not filing that tax return is a criminal violation, but nobody thinks that the IRS is defining the scope of the criminal law, though in some sense it is by telling you what the civil requirement is. Well, this is different in the sense that the Attorney General is deciding what law applies, not whether a particular act or a particular exercise in commercial activity is covered by an act that certainly applies in a general sense. I mean, it's not this – in those instances, even in Toobie, it's exercising fairly refined authority with respect to what activity is covered. Here it's just saying are you going to be – it's not just covered by a law. Does the law even apply to you? And it seems to me that those – that's a substantive difference. I don't know, Mr. Chief Justice. I don't know why we would think that specifying whether the drug you're holding is lawful or unlawful, whether your bridge has to be taken down, whether you can graze on public land, whether your rates are unreasonable, is different in kind from whether you have to register going forward and report to the federal government. Either way, the executive branch tells you whether your conduct brings you within the scope of the law or it doesn't. Well, but it's – the bridges, yes. I mean, the executive branch has to specify what type of bridge needs to be, what height or whatever, and if it's this or that. But there's another – it's a different thing when the Attorney General says, okay, here's a law that covers bridges, you get to decide whether it governs at all in particular areas. I understand if SORNA didn't have the kind of guidance that it had here. If it hadn't defined the criminal offense, if it hadn't fixed the punishment, if it hadn't set a reticulated scheme on the civil side, I understand that if it hadn't made all of those judgments, there could be more serious problems. But to do all of that and then say, but look, we know that there's going to be some – SORNA requires a lot of things. Provide your motor vehicle information. Provide your DNA. Provide your photos. Do periodic show-ups. And there's no dispute, I think, that the state registries at the time SORNA was passed were not equipped to do all of that. And so Congress, looking at that, said, look, we've got hundreds of thousands of people out there we want to bring into this system. We know they can't all come in on day one. There's going to be some transitional issues that we're going to have to work out. And the person to work those out is the person who, for the last 12 years, has been dealing with exactly that subject and interacting with the states. And at the end of the day, that's really much more about implementation than it is about policy judgment. I mean, here it really is inside of the Grimaud, the Fahy, the outer bound, because you've got an intelligible principle that's anchored in the text of the statute, not always true in some of those cases, like Grimaud and Fahy. And you really have what's much closer to a classic executive function, because it's just specifying the applicability of the requirements themselves. It's not even like the Attorney General is providing the substance of those requirements. And even that, of course, the Court has said okay. But I just think we're — Mr. Wall, I want to develop a little bit what Justice Breyer was after. Is there something unusual about the Attorney General's presence in this case as the chief prosecutor and kind of a conflict of interest? And what if instead of feasibility you were arguing just and reasonable or in the public interest, other standards that might have applied in a civil delegation context, would you think that the Attorney General of the United States could decide the applicability of a criminal law for a half a million people on the basis of his or her judgment about its public interest or whether it's just and reasonable? Or do you accept the suggestion of this Court in Toobie that delegations in the criminal context involving the Attorney General may merit a heightened standard of review? Justice Gorsuch, I don't think the Court needs to cross that bridge here. I understand that. I'm asking you to answer that question, though. And I want to try to. I think the Court has had several cases where criminal penalties were indirectly or directly involved, from Grimaud to Yackas to Loving, Mestreda. It's never suggested, even when faced with this exact argument in Toobie, that the bar ought to be raised higher. But I'll grant that in Toobie the Court said it didn't need to address that, though it had never done that in any of its previous cases, and just say, look, if this statute did that, if it did nothing more than say to the Attorney General, register them, you know, as reasonable, with no requirements, no creation of the criminal offense, no fixing of the penalty. No, just in reasonable or in the public interest. Would those be okay or not okay? I think as long as it's done the things it did here, it's created the crime, it's defined the elements. Those would be okay. It's fixed the penalty. And then on the civil side, it is said, and you've provided some standard like that in the statute, the Court's cases indicate that's enough. But I do want to say, even if you think that's not enough, this statute does come from the public interest side of that, because this is not an agency just supplying all of the real content or substance to a broad standard like public interest or just and reasonable. Reading the statute, Congress made a lot of those judgments for itself and left to the Attorney General a much narrower practical problem. There's a lot of discussion in our case law about the propriety of the Court reading into statute words. And I think a fundamental issue that Justice Gorsuch has been aiming at is, especially in criminal law, is it just to delegate to the Attorney General a fundamental decision about who gets covered or doesn't get covered by a statute? That seems like at the core of what a law is. If someone does X act, you're covered or you're not. And if Congress had said that, we probably wouldn't have found a retroactivity problem. But what is the essence of non-delegation that we don't let the legislature define who's a criminal? And so isn't retroactivity a definition of who's a criminal? So two separate points, Justice Sotomayor. Or who might be a criminal because of their actions. Two separate points. First, if Congress had given the same authority to the Attorney General and not otherwise expressed any intention with respect to how that authority would be exercised, I'll grant that it would be. There's no plain words that add maximum feasibility in this statute. So you're discerning words. I am, Justice Sotomayor. And that's my second point. I'm doing exactly what the Court did in Grimaud, Fahy, Colick, Loving. In none of those was the intelligible principle spelled out in the statute in so many words. And the Court engaged in an interpretive act. It looked at the act as a whole and said, based on the provisions we have, would a reasonable Attorney General understand or a reasonable executive official understand what policy they were meant to pursue in exercising this authority? And to be honest with you, I think it defies both the text of SORNA and reality to think that Congress was agnostic about whether hundreds of thousands of people who have committed very serious sex offenses, as Petitioner has, should be required to register. I think there's no way to read SORNA's text, its legislative history, and not come away with the firm and definite notion that Congress wanted as many of those offenders in the system as the Attorney General could get in. And it was just a practical problem how to accomplish that. If you take out legislative history and you take out policy statements, because there are some of my colleagues who don't rely on either of those two things, what's left? I would say the findings in 20901, the statement of express statutory purpose, which this Court has relied on in cases like NBC and New York Central for a comprehensive national system, the inclusive definition of sex offender, the broad registration requirement in 2913A, and then the text and title of 913D, which say that this grant of authority was about addressing the inability to comply. We know on its face that what spurred this was a practical consideration, a concern by Congress about how to get these people into the system. All of those things taken together, I think, the intelligible principle here, far more anchored in the text of this statute. Then take a case like Fahy, where Justice Jackson for the Court looked at the norms of the banking industry, or Grimaud, where the Court discerned it from a number of other statutory provisions that I don't think were as definite as what it faces here. Loving, the same thing. Collick, the same thing. I think here you've got an intelligible principle, a general policy, that really is anchored in the text of the Act, even apart from legislative history and policy statements and all the rest, which we have not relied on in our brief. Breyer. The part that's still gnawing at me. I mean, your basic argument is there is a standard here. That's the end of the case. Right. But in writing it, I guess I have to think through the non-delegation doctrine. So I'm just interested if this strikes any thought in your mind. Let's take the Securities Act of 1934. What it says is you can't use a manipulative device. That's a fraudulent device. That's the equivalent here of the sex offense. It says you cannot use them in contravention of such rules as the SEC may prescribe as appropriate in the public interest. Suppose instead of that word SEC, everything is the same, but it doesn't say SEC. It says attorney general. So what you have is it is a crime to violate a rule where it concerns a manipulative device in violation of such rules as the attorney general finds appropriate. The difference being we don't think he's an expert on securities, though the SEC is. Right. Does that matter? Should it matter? Should we suggest in the opinion that it might matter? So to the extent it matters, here's what I think you could say in the opinion. If the executive official, the attorney general, were defining the elements of the offense or defining the criminal punishment, that would raise the to be question. But where the attorney general or the executive official is defining a civil requirement, as with the 34 Act, to which criminal consequences can possibly attach, that falls squarely inside a handful of cases where the court has proved exactly that. So I think the court can set aside the tougher case than this one where Congress hasn't defined the elements of the offense and fixed the punishment itself, but left those things to the executive branch. I do want to say just a word about the harms here before I sit down so that we all understand what's in play. Eighteen jurisdictions have substantially implemented SORNA. Of the remaining 32 states, 26 of them have taken Federal funds and are attempting to substantially implement, but they're not there yet. If Petitioner prevails, I believe, though Petitioner's briefs don't say, that all of their arguments translate not just from the pre-Act offender clause, but also to the pre-implementation clause. And if that's right, there will be no Federal duty to register in the 32 states that haven't substantially implemented. As a matter of Federal law, more than half the country will be a sex offender registration-free zone. Even in the remaining 18 states, they will not be picking up new pre-Act offenders who come into contact with the justice system because there will no longer be a duty to register. All told, our best estimate is that we'll lose a couple of thousand people out of the registries every month. And that's not even including tribal areas where we wouldn't be able to get at non-tribal members. And, of course, some substantial portion of the 4,000 convictions at issue would be in jeopardy of being vacated either on direct or collateral review. SORNA's efficacy, if Petitioner prevails, will not just be sharply curtailed. It will arguably be thoroughly gutted as a matter of how this Federal law works. And if it is possible, and we think it is not just possible, but the most natural interpretation of the Attorney General's authority to say, this is a narrow authority to specify the applicability of requirements in an on-off way in order to get people into the system, and that interpretation avoids constitutional problems, right? It's constitutional. If we read it to say, do it to the extent you can, then, as Petitioner concedes, I think if it's possible to read the statute that way, that's constitutional, and that's what we would urge the Court to do. If there are no further questions. Thank you, Mr. Wall. Ms. Baumgartel, you have four minutes remaining. Thank you. Just to pick up where my friend left off, I want to emphasize that prior to SORNA's enactment, every single State had an existing sex offender registry, and those will continue to exist and to require the registration of offenders, regardless of what happens with SORNA. Individuals like Petitioner were required to register under existing State law, and they will still be required to register. This was a law whose retroactive application was opposed by the States, which is part of the reason why only 18 States have implemented it. States spoke out against the retroactive application of the law before the Attorney General made his determination, and so States themselves, who are the experts in this area, having run registration systems for years, don't want this act to be fully retroactive. My friend emphasized that this delegation was all about practicality, but the reality is that the Attorney General's promulgated rule does not account for practicality in any way, which is further evidence for this Court that, to the extent feasible, was not the standard of this delegation. That is not the standard that exists in the text. It is not the intelligible principle that was found by any circuit court to consider this issue, and it was not even the intelligible principle that the Attorney General himself said that he was acting pursuant to when he issued his regulation. In his final regulation, he said that Congress delegated to him, and I quote, the discretion to apply SORNA's requirements to sex offenders to the extent that he determines that the public benefits of doing so outweigh any adverse costs. So the Attorney General believed that his discretion was to essentially undertake the fundamental policy determination as to whether the costs outweighed the benefits. He did not view this as an issue of feasibility or practicality. Finally, I'd just like to emphasize the special nature of this delegation. This is not licensing. This is not civil rulemaking. This is the retroactive application of criminal law penalties that affect individual liberty interests in the most profound way. This is the area where the Constitution specifies that there must be a division between the lawmaker and between the executive, and for that reason, this delegation is unconstitutional. Thank you. Thank you, Counsel. The case is submitted.